JULES TALON *et al. vs.* CHARLES JACKSON, *Ex.*

JANUARY 8, 1943.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

FLYNN, C. J.   This is an appeal from a decree admitting to probate an instrument purporting to be the last will and testament of Ezilda Mercier, deceased. After a verdict by a jury in the superior court sustaining that will, the trial justice denied the appellants' motion for a new trial. The case is before us on their exceptions to this and other rulings made during the trial.

The appellants are Jules Talon, a brother, and Armina (referred to as Hermina) Talon, Heloise Theberge, Elzire Talon and Adelosa Larivee, sisters of the testatrix Ezilda Mercier. The appellee is the executor of her will and is the husband of Lucy Jackson, nee Mercier, a sister of Joseph P. Mercier, deceased husband of the testatrix.

The reasons of appeal relied upon were, in substance, that Ezilda Mercier lacked testamentary capacity at the time

this will was executed, and that it was executed by reason of undue influence exerted upon her by the appellee and his wife, or either of them. In the first trial, at the conclusion of the evidence for the *appellants,* the trial justice granted the appellee's motion for a directed verdict sustaining the will; and the appellants' exception thereto was sustained by this court. *Talon v. Jackson,* 66 R. I. 302. In the new trial, with which we are now concerned, the appellants again introduced substantially the same evidence but they also made some additions bearing particularly upon the alleged defective mental and physical condition of the testatrix. On the other hand, testimony by the appellee and his wife, together with that of other witnesses in their behalf, was presented for the first time. The case was thus fully tried and the voluminous transcript shows clearly that there was conflicting evidence which presented material issues of fact for determination by the jury.

For obvious reasons a statement of all the material evidence will not be attempted but the following general references to some facts will assist in understanding the case. The testatrix was the mother of a daughter Ernestine, who never married, and after her father's death she and her mother continued to live together. The mother had little business experience and depended greatly on Ernestine to manage her financial affairs, since the latter was a competent, experienced and successful business woman. Ernestine died January 19, 1936, leaving a will in which she made her mother the beneficiary of all her estate and named Charles Jackson, the appellee here, as the executor to serve without surety on his bond. This estate ultimately distributed over $22,000 and originally included a promissory note in the sum of $3000 which was made by Calix Talon, father of these appellants, and was secured by a mortgage on the realty in which they lived. The mortgage and note had been transferred to Ernestine by her father, a few days before his death, on April 1, 1933. Apparently the appellants had paid no interest nor any of the principal of this mortgage, but it never

was foreclosed by Ernestine nor by the estate of testatrix which later, upon approval by the probate court, had purchased it.

After Ernestine's death her mother was lonesome but desired and continued to live in her own tenement where she apparently did her own household work. At night her sister Hermina would come and stay with her but would return to her own home each morning. The appellee visited the testatrix regularly on Wednesday or Thursday and Saturday of each week and on Sundays and holidays he and his wife would take her on automobile rides and to dinner at their home or elsewhere. The testatrix, together with her husband and daughter, customarily had dinner and went for rides with the Jacksons on Sundays and holidays even as early as when usual travel was by horse and carriage. After the husband's death she and her daughter had continued this friendship and practice.

About six months after Ernestine's death in January 1936, Hermina discontinued spending the nights at the testatrix's tenement and the latter then began to sleep each night at the Talon house. She would return, however, on the next morning accompanied by her brother Jules. Except for occasionally doing a few minor chores, he would leave and she would spend a good part of the day in and around her own tenement or with neighbors.

When the Jacksons took the testatrix out to ride, they would meet her at her own tenement. On returning at night they never brought her into the Talon house but usually left her on the sidewalk nearby. They explained that the Talon family had shown some feeling against the Jacksons from the time the appellee was known to be executor of Ernestine's will; and that, according to the testatrix, her family thought that they should handle the affairs of herself and her daughter "without getting an outsider to do it." There was also testimony to the effect that the appellants' niece Mary Alice Theberge had tried unsuccessfully to have Ernestine authorize her to take charge of these affairs.

When the appellee was informed by the attorney that the estate of Ernestine should be closed and the property therein should be turned over to her mother, as beneficiary, he notified the latter on one of his regular visits. She then expressed a desire that he continue to manage all her property as he had done for Ernestine. He testified that he was reluctant to do so because such management by him already had caused the Talon family to impugn his motives and to criticize the testatrix to the point of making it unpleasant for both; but that, at her insistence, he finally consented. The testatrix instructed him to have the attorney who took care of Ernestine's affairs arrange to meet her and "to make" the necessary legal papers. She also wanted Mr. Messier, an official of the Credit Union "Bank" in Central Falls to act as interpreter. Although the testatrix understood English, she spoke it brokenly; but she understood and spoke the French language.

The appointment was made accordingly for December 4, 1937. The Jacksons called for the testatrix and drove her to the bank, where they met the attorney and Mr. Messier, who took them into the directors' room. The attorney, from his understanding of the testatrix's instructions previously transmitted by the appellee, came prepared to have her execute a petition for the appointment of a conservator of her estate. The sole ground set forth therein was that she was not able because of her advanced age to properly care for her property. This petition was explained through the interpreter before she signed it by her mark and it was later filed in the probate court and still later was granted.

After this petition had been discussed and signed, the testatrix spontaneously told the attorney that she also wanted to leave all her property to the appellee. The attorney then questioned her further in this regard and asked if she wanted to make a will. She replied affirmatively and the attorney then discussed this matter further with her. He inquired whether she did not want her will to cancel the "Talon mortgage", thereby avoiding possible embarrassment. She agreed

and directed that her will be drawn in that way. He told her that he had not come prepared to draw her will, but he then made an appointment to meet her there on the following Monday, when he would bring a form of will drafted in accordance with her instructions. The Jacksons, who were present, testified that this was the first intimation they had of her intent to make a will.

On December 6, the Jacksons at her request called for the testatrix and brought her to the Credit Union. There they met the attorney, an associate who was to act as a witness, and Mr. Messier, who was asked to interpret again. Upon the latter's invitation, they went into the directors' room, the Jacksons went to another part of the bank, and the door of the room was closed.

The draft of the will was then explained to the testatrix sentence by sentence by the attorney through the interpreter Messier, and she answered "yes to everything". Sometimes she answered in "broken English" before the interpreter had an opportunity to complete the pertinent translation. This will directed that, after the payment of debts, the Talon mortgage be cancelled if the testatrix owned it at the time of her death. All the rest and residue was devised and bequeathed to the appellee, who was also named executor. The will so drawn, explained, and approved, was then executed by the testatrix by her mark and was witnessed by the two lawyers and the interpreter.

Up to this time the testatrix had never lived with the Jacksons and she was then spending each night at the Talon home. She never told her sisters or brother that she had made a will and they testified that she told them repeatedly that they would have all her property when she died. They also testified that she had suffered two previous "shocks" which had affected her mentally and physically and that she acted "childish". But she continued as before to visit her own tenement and to work there daily and to go for rides with the Jacksons on Sundays and holidays. This went on until about February 25, 1939. On that date, according to

appellee, when he made one of his regular visits to her, she was upset and crying over something that she later complained had happened at the Talon home. She indicated that she wanted to be taken to the appellee's wife, and he drove her to his house on Sayles avenue in Pawtucket.

When they arrived she told Mrs. Jackson, in substance, that she wanted to live there the rest of her days because the conditions at the Talon home were so disagreeable,— they had said so many unpleasant things to her, and were always nagging and trying to get her to give them the control of her property and to do what they wanted. She also had told Mrs. Jackson that the Talons would shut the door of her room at night and "they would talk about her" and that she had overheard some of them say that "they would put her away"; and that was why she desired to live with the Jacksons. When she did not return that night Elsie Newell, a niece, telephoned to the appellee. She testified that he said he would not bring her aunt home that night because the roads were too slippery for driving. This statement was denied by the appellee and an official weather reporter testified from records that it was not slippery. She telephoned the next day and was told by Mrs. Jackson that the people in the Talon house knew "what they have done to her" and why testatrix did not desire to go back to them.

While the testatrix was at the Jackson home, until her last illness, none of her sisters ever attempted to visit her. The brother Jules called there twice and he admitted that on each occasion he was greeted in a friendly way by Mrs. Jackson, who went to another room to tell the testatrix that her brother wanted to see her. The testatrix informed Mrs. Jackson that she did not desire to talk with him and refused to have anything to do with him. There was also evidence that the appellants, through their attorney, had been expressly assured of the Jacksons' welcome if any of them desired to visit the testatrix.

A nephew came to visit the testatrix several times and always was able to see and talk with her. On some of these

visits he urged the testatrix to return to the Talon house and, on the last one, asked her to go to see his mother who was sick. Shortly after this visit, on September 3, as the testatrix was about to go out for a ride, she suffered a cerebral hemorrhage from which she died on September 6, 1939. The Jacksons promptly notified the appellants, as soon as their sister was taken ill, and called for and brought some of them over to see her.

The appellants' niece, Mary Alice Theberge, testified that Mrs. Jackson told her on this occasion that the testatrix liked automobile rides so much that the Jacksons could get her to do anything they wanted by threatening to discontinue such rides. The Jacksons denied making such statements and denied that they ever tried to influence her. They asserted that she always did whatever she pleased. This niece was present when Dr. Donley, a specialist, had examined the testatrix at the request of the *appellants,* and had reported to them that she was not of unsound mind; but she thereafter filed a petition seeking her own appointment as guardian of the testatrix's person and estate, alleging therein that the testatrix was of unsound mind, *etc.* Dr. Donley also testified that he had no difficulty in carrying on a connected conversation with the testatrix concerning her life, property and certain current events; that she gave no substantial evidence of previous shock; and that she understood the nature of what he and she were saying, her difficulty being largely with expressing herself in English.

There was much more evidence having a bearing on the issues and on the credibility of the witnesses. Most of the testimony was sharply conflicting and both sides depended to a large extent on the credibility of the witnesses who testified as to what the testatrix had said and done in her lifetime. · · ·

The appellants expressly have waived twelve of their twenty-seven exceptions. In their brief and argument, they have discussed the remaining exceptions as follows: (1) To the ruling of the court (exception numbered 2) permitting

objections to be made by both counsel for the appellee; (2) to rulings of the court with relation to the admission or exclusion of testimony, or his refusal to strike out; (3) to the ruling of the court admitting appellee's exhibit 11, the same being a complaint and warrant against Jules Talon; (4) to the decision of the trial justice denying appellants' motion for a new trial. We shall discuss them in that order.

The appellants first contend that the trial justice erred in permitting objections to be made or argued by "both counsel" for the appellee. They contend that only one attorney for each side may be permitted to make such objections under Rule 23 of the Rules of Practice of the Superior Court. This rule reads: "The examination and cross-examination of any witness shall be conducted by one attorney only on each side. The attorney shall stand while so examining or cross-examining, unless, for satisfactory reasons, the justice presiding at the trial shall suspend this rule in a particular case. Not more than two attorneys on the same side will be allowed to argue any question to court or jury." In our opinion that rule does not expressly prohibit the making of objections by two attorneys on the same side. Moreover, the transcript discloses no confusion or lack of order and decorum occasioned by such objection. We are unable to see wherein the appellants were prejudiced thereby and the second exception is overruled.

The second group of exceptions relied upon relates to rulings on the admission or exclusion of certain evidence. The appellants concede in their brief that "some of these rulings when considered separately might do little harm"; but they assert that "when all of them were taken collectively, the effect was certainly harmful to the appellant and constituted reversible error". We have examined the rulings in question and we are of the opinion that, considered individually or collectively, no reversible error was committed therein. These exceptions, therefore, are overruled.

The appellants next stress particularly exception 26, to the admission of appellee's exhibit 11. This exhibit ad-

mittedly was a certified copy of the record of the eleventh judicial district court. It included a complaint and warrant duly sworn out against Jules Talon, alias, dated September 18, 1917, charging that the defendant therein was "an idle person of doubtful reputation, and having no visible means of support . . ." and also showed defendant's plea of guilty thereto and his placement on probation. Appellants now contend that its remoteness, its lack of probative value and its lack of identification with the appellants were not explained or limited and that "the circumstances surrounding the admission of this exhibit could only stir the imagination of the jury".

Obviously, this complaint and defendant's plea of guilty thereto were offered as affecting the weight that might be given to previous testimony by the appellant Jules Talon. At the trial no question whatever was raised as to the identity of the defendant in the complaint with that appellant. Indeed, the reasonable view of the objection, as it appears in the transcript, is that the appellants admitted such identity and objected to the exhibit solely on the grounds of its remoteness and tendency to prolong the trial. In any event, under all the evidence and circumstances appearing in the transcript, we are of the opinion that the admission of exhibit 11 did not constitute reversible error and, therefore, the twenty-sixth exception is overruled.

The last of the exceptions relied upon relates to the refusal of the trial justice to grant the appellants' motion for a new trial. Under this exception the appellants concede that, where the evidence is conflicting, the trial justice's decision on such a motion will not be set aside unless it is clearly wrong, and also that his rescript thereon ordinarily will be given great persuasive force. But they contend that the trial justice's rescript here shows that he failed to exercise his independent judgment in passing on the evidence and that his refusal to set aside the verdict was based upon a misconception that he was bound to accept the jury's determination of pure questions of fact upon conflicting

evidence. The duty of the trial justice in deciding a motion for a new trial after verdict has been repeatedly set forth. *Nichols* v. *New England Tel. & Tel. Co.,* 57 R. I. 180, and cases cited; *McMahon* v. *Rhode Island Co.,* 32 R. I. 237. See also *Raleigh* v. *Fitzpatrick,* 60 R. I. 79.

Having such duty in mind, we have examined the rescript and we cannot agree with the appellants' contention. Unquestionably the trial justice exercised his independent judgment on the evidence and expressly approved the verdict, in so far as it involved the issue of testamentary capacity. This apparently is now conceded by the appellants. In our opinion, the evidence amply supports that view.

On the issue of undue influence, after summarizing the evidence and contentions respectively for each side so as to point out the sharp conflict, the trial justice stated: "There was room for either view but the questions presented were questions of fact and therefore, in this Court's opinion, properly determined by the jury". Again, in referring later to the jury's finding on this issue, he stated that the opportunity to exercise influence on the testatrix was undoubtedly present; but he expressly pointed out that the jury had been very carefully instructed as to the difference between due influence and undue influence and then went on to say: "The Court does not feel justified in disturbing this finding of fact. If the jury had found to the contrary, this Court would not have set aside its verdict."

From a consideration of the whole rescript as it relates to this issue, it appears to us that the trial justice made his own examination of the evidence and came to the conclusion that it was so conflicting and so nearly balanced that different minds could naturally and fairly come to different conclusions thereon. As we view the rescript, the trial justice appears to have acted in accordance with the law stated in *McMahon* v. *Rhode Island Co., supra.* In that case, in discussing the duty of the trial justice on a motion for a new trial where the evidence was sharply conflicting, the court, at page 242, said: ". . . and when the evidence is nearly bal-

anced, or is such that different minds would naturally and fairly come to different conclusions thereon, he has no right to disturb the findings of the jury, although his own judgment might incline him the other way. In other words, the finding of the jury is to be upheld by him as against any mere doubts of its correctness." See also Colgan v. United Electric Rys. Co., 62 R. I. 184, 189, and cases cited.

In our opinion, it does not appear from his rescript that he misconceived the law or overlooked any material evidence and we cannot say that his decision on the conflicting evidence was clearly wrong. This exception, therefore, should be overruled. However, assuming that the trial justice failed to perform his duty on this motion, thus requiring our examination of the evidence apart from his rescript and decision, the verdict should not be set aside by this court unless such examination of the conflicting evidence shows that the verdict was contrary to the great weight of all the evidence. McMahon v. Rhode Island Co., supra; Spiegel v. Grande, 45 R. I. 437, 440.

From our examination of the transcript, apart from the rescript of the trial justice and without the opportunity to see and hear the witnesses as they testified, we cannot say that the verdict of the jury was against the great preponderance of the evidence. The burden of proof was on the appellants to show that the will was executed as a result of undue influence exerted by Charles Jackson and Lucy Jackson, or either of them, as they alleged. Both sides relied strongly on evidence of what the deceased had said during her life and therefore such evidence of each side required careful scrutiny. The evidence and inferences therefrom on the issue of undue influence were sharply conflicting on certain material points and reasonable men could naturally and fairly come to different conclusions thereon. Under all the circumstances as they appear in the transcript and without the opportunity of seeing and hearing the witnesses, we cannot say that the verdict was against the great preponderance of the evidence. Therefore, whether we give the

500

usual weight to the trial justice's rescript or consider the evidence wholly apart therefrom, we are unable to sustain the appellants' exception to the denial of their motion for a new trial.

All of the exceptions of the appellants are overruled, and the case is remitted to the superior court for further proceedings following the verdict.

*Thomas L. Carty,* for appellants.

*Hogan & Hogan, Edward T. Hogan,* for appellee.